Good afternoon, Your Honors, and may it please the Court, Sean Brady on behalf of the Appellants. The Supreme Court's decision in Heller and this Court's recent decision in Duncan v. Becerra make clear that laws that flatly ban Second Amendment-protected arms fail any level of applicable scrutiny. California generally bans rifles that it has dubbed assault weapons. So as a practical matter, the dispositive question in this case is, does the Second Amendment protect the arms, the rifles, that California has banned? Because if those rifles are indeed arms that the Second Amendment protects, Heller and Duncan tell us that the remainder of the analysis is a foregone conclusion. Does Heller say that? Put aside what Duncan says for a second, because Duncan does an alternative. Duncan says, we think, but here's an alternative analysis. Does Heller say that any arm, any firearm that's within the protection of the Second Amendment can't be banned, no matter how dangerous? I thought Heller talked about handguns being the quintessential Second Amendment weapon, and therefore they couldn't be categorically banned. But where in Heller does it say that no weapon can be categorically banned? Well, Your Honor, Heller was addressing the overall scope of the Second Amendment in the first part of the opinion, and then it applied it to a handgun ban. Yeah, so I'm looking, I'm looking at Heller for a statement by the Supreme Court that any time a weapon is banned, that is a kind of weapon that might be covered by the Second Amendment. So we're not talking about cannons or atomic bombs, that that automatically violates the Second Amendment. Can you point me to that language in Heller? Well, I would point you, Your Honor, to the language that says that arms that are typically possessed by law abiding people for lawful purposes are protected. And the question of whether firearms other than handguns was not before the court. But I think it's implicit if there's fire. No, here's here's my problem. I don't want to spar with you. I'm trying to understand. I understand they're protected, at least to the extent that they're commonly held. My question is, you said it's automatically invalid. And I'm trying to figure out why you get from Heller that this is automatically invalid as opposed to some intermediate level of scrutiny. Because Heller said that because handguns were protected, they could not be banned. It did not have before the these specific firearms. But I think that's implicit from how Heller was was written. It does not apply necessarily for handguns. The case teller was not about just handguns. That was the law. I understand. And here's here's what I'm trying. I'm struggling with with your argument. The Ninth Circuit cases seem to say, and they're, you know, some of them are not as as clear as others. The first question is, do you have a firearm protected by the Second Amendment? And we we look at that to see it whether it's it's not protected if it's both dangerous and not commonly held. And I start out with the notion that assault wipers are commonly held and therefore they're protected. The Ninth Circuit cases then seem to say, OK, now we have to decide whether to apply strict scrutiny or intermediate scrutiny. And they go through several other steps. Are there reasonable alternatives, et cetera, et cetera? Is there a grandfather clause? So you proceeded directly in your argument from the first point that they are protected by the Second Amendment to the notion that any ban is automatically unconstitutional. Trying to figure out how you square that with the cases that say the next step is to analyze whether or not we apply intermediate scrutiny or strict scrutiny. Sure. Let me just clarify. So maybe this will help your honor. Because what I said was that as a practical matter, the dispositive question is I didn't mean to suggest that you wouldn't have to go through, continue going through the analysis. But all I'm saying is that that analysis is a foregone conclusion if you're talking about a ban, because even under intermediate scrutiny, there has to be narrow tailoring. There has to be a fit and a ban. There's been no case law that I've seen that suggests that a ban on something, at least from the Supreme Court or this circuit's precedent, that a ban meets the narrow tailoring requirement. Neither the state nor the district court provided any explanation of how this law is sufficiently tailored to meet intermediate scrutiny. And so I didn't mean to suggest that, you know, you just say these are protected and sign your name, you know, reverse. And that's all she wrote. I do believe you have to go through the analysis. OK, so so that's helpful. So you think we apply intermediate scrutiny or strict scrutiny? I believe strict scrutiny for the same reasons the Duncan court applies for scrutiny. But ultimately, I really don't think this court needs to struggle that much with what is the applicable scrutiny here, because even under intermediate scrutiny, the plaintiffs prevail, the appellants prevail because this is a ban. And again, not only can the government not meet its fit, but Heller, another thing Heller tells us is that the sole focus of this ban is to address what the state says are public mass shootings, which is obviously a terrible scourge that everybody wants to address. But what Heller tells us is that that is not appropriate. That's not an appropriate approach to restrict arms among the law abiding in order to address the criminal misuse of them. If that were the case, Heller would have been decided the other way. Handguns are used in far more crime than than these rifles. They're using far more mass shootings. The record shows that. Counsel, can I ask you, what do you think the rule shall be of when we should use strict versus intermediate scrutiny when it comes to a ban on weapons? As our briefing indicates, and this is obviously pre-Duncan, I think that just like the Heller court, it bans eschew these types of analyses. I don't really think you need to engage in that. That said, I understand this court's bound by Chauvin and has to do that. And I think that the Duncan panel laid out a very good measured approach about how to do that. And when you're talking about a complete ban, as there was with the magazines and there are with these rifles that extend into the home, and there's no exception even for in-home use, then you are now talking about the core of the right self-defense within the home. So you check that box. The next box is what is is it a substantial burden? What level is the burden? And as the Duncan panel correctly noted, again, a ban on arms that are protected by the Second Amendment is a severe burden and saying that there's alternatives to those is not sufficient to remove that burden. That that's the Heller court expressly said that it's expressly said that just because long guns were still available to people in the District of Columbia, that did not say the handgun ban. And I believe the inverse of that is true as well. Can I ask a follow up to that? Do we do that analysis on a feature by feature basis in this case? Because I notice you don't challenge the the grenade feature. So do we have to do that for, you know, the pistol grip holding stock or is it is it do we do this altogether? You know, I don't think you I think that you can look at these firearms as a unit, because that is generally how these firearms, at least the most popular one, the AR-15 comes. But I think doing it feature by feature could would be actually more beneficial and helpful to appellants, because it would show to be at the risk of losing decorum. It would show the absurdity of why these features are restricted. I mean, we're talking about an adjustable stock. If it if your stock moves an inch or two on your rifle, then then you're a felon. If it doesn't, then you're fine. If you hold with a pistol grip, then you're a felon. If you hold it like a standard old hunting rifle, then then you're fine. And the reason that these the features are important to look at is that that is how the state is targeting and identifying these rifles, right, defining them, what is banned by these features. And those features do nothing to change to alter the rate of fire. They don't do anything to make the firearm have more ammunition. All it does is makes the firearm more controllable, which increases accuracy. A notion like my difficulty with the features argument is, I guess, unless you start out with the premise. That if if they could bend the weapon entirely, adding the features to it makes the ban less inclusive, doesn't it? So really, the question is whether the weapon could be banned entirely. There are fewer than 100 percent of all assault rifles that are banned by the features inclusion because it it restricts the number. And so the real question is, it seems to me the features are irrelevant unless the assault rifle itself could be banned. Correct. I think that might be right in some instances, and your honor raises a good point that some of the firearms that are listed as assault weapons do not have the features. And as a matter of fact, some of the way California law works, even all the rifles that are listed, we call them category one or category two, but the ones that are listed by the penal code or in regulation, it doesn't matter even if you remove the features, they are. But this is not an equal protection argument. In other words, what you're saying is a firearm that I'm entitled to have has been banned. And it seems to me it doesn't help your argument to say, well, the ban isn't complete because there we've added some features to it that not all of them have. So it seems to me your argument turns on whether or not the ban of semi-automatic weapons is OK, not whether or not this particular the particular limiting characteristics the state has put on it are rational. I agree, your honor, that that we have to. Well, our case depends on rifles, semi-automatic rifles being protected by the Second Amendment. That's right. Our position is that they are. And the state doesn't even if they're not if they're not, the addition of these features really doesn't make a difference, does it? Now that I would agree with that, although I would say that we obviously believe that these rifles are indeed protected by. No, I understand you. So let me let me ask you to address, if you would. This this issue has come up in front of five other circuits as close as I can tell, not identical statutes, to be sure, but all of which involve some sort of ban of semi-automatic weapons. The other five circuits have applied an intermediate level of scrutiny and under that level have found the bans to be constitutional. Why were they wrong? They were wrong for number one, they they didn't apply. They don't have the same test for deciding stricter intermediate scrutiny. But assuming intermediate scrutiny as the Ninth Circuit does, but assuming that intermediate scrutiny should be the appropriate test, I think they were wrong because if something is constitutionally protected, if it can be banned, then what good is the constitutional protection? It's essentially meaningless. And I have yet to see any case law cited by the state or raised by the district court that showed that constitutionally protected activity can be wholly banned. By by analyzing in a way with intermediate scrutiny, if these arms are indeed protected, then there has to be protection, has to mean something. And that that's something is that they cannot be wholly banned. They can be regulated and they already are significantly regulated. Under California law, you have to go to a licensed gun dealer, you have to undergo a background check, wait 10 days for these types of rifles, specifically when they were legal to acquire. You had to then re-register them and they're treated. They're listed as assault weapons in the California's in California Department of Justice's database and you're restricted on your uses of them. So these are all regulations of the right. What what we have here is not a regulation. It is a ban. If California were to enact a statute and say instead of saying you may possess these kinds of weapons, but you may not take them outside the home. Would that be constitutional in your view? That that would be a much tougher. I think it's a different case. I mean, I'm trying to find out what your view is. I think that there has to be some outlet for training. So if you if there was some regulated way to take the firearm, because, you know, I don't think it's in anybody's interest, the states or the individuals to have a firearm that they're not able to train with and learn how to use. So if there was some outlet. So I'm trying to I'm trying to build off of your answer. So if the statute says you may buy these only from a licensed firearm dealer who will train you at his premises about how to use them and then they can only be kept in the home, would that be constitutional in your view? I don't think it would be, but that would be a much more difficult case than what would what would be the difficulty with that statute as a constitutional matter? Well, there the right to the Second Amendment protects a right both to keep and to bear arms and bearing arms, in my opinion, in my view, means in public. Now, that may not necessarily mean these types of rifles. And that obviously means, you know, Heller was clear that the Second Amendment does not protect carrying arms in certain sensitive places. But a have a heavy restriction on these rifles being out in public generally, I think, would would go a step too far. Would you what would be your take on a law that bans, just say one particular make and model of an otherwise lawful weapon? I think that that would have to be treated the same way as a ban generally, unless there was something specific about that make and model that required it to be regulated differently. And the reason being is this is going on in California currently with these types of rifles and handguns is they can just pick one and then another one. And at what point do you whittle down the list of what arms are available and say, OK, well, now we can't we can't let any more off the list. So I'm not sure that's a response to Judge Bress's question. And I'm interested in your answer. So let's assume it didn't happen. The California says you may not possess an AR-15, but that's it. You can possess every other semiautomatic weapon in the world. Would that be would that ban be unconstitutional? There might be an equal protection argument that the makers of the AR-15 could make that you've acted irrationally towards us. But trying to think it out from the perspective of a citizen, would that ban be unconstitutional? I think it would be because, again, I think if so, you think the Second Amendment gives somebody the right to his choice of the type of weapon? Yes, I think Heller actually the way that Heller left that test out within reason, the the choice by the American people. Right. If these are arms are typically possessed by law abiding people for lawful purposes, that doesn't mean some some interesting guy who wants to go out and get a flamethrower. And says, well, my preferred arm is a flamethrower, gets to do that. This is dictated by the market of millions of people. And if millions of people, if millions of people bought flamethrowers, would your answer be different? If millions of people had flamethrowers and they were common arms for self-defense, I think so. But that's that's not the case. How about Clay? How about what I'm trying to again, I'm not trying to joust with them, trying to figure out the limits of your argument. If millions of people bought Claymore mines, would those be protected? No, bad against them, be unconstitutional. I think that and your point, your your honor's point is well taken. There is some vagueness about what the test that Heller laid out does say and protects. And when you get out to those outer fringes, it does get a little a little difficult to discern. But I think this case is a lot is not that. It's much more simple when we're talking about. Can I ask one of those threshold questions that Heller raises? You've mentioned that this is the this this California's ban is the first ban in the nation. But I don't know if you've read the Everytown Brief. They suggest that there were some regulations donning back to 19th, the 1920s. How do you respond to that? Yes, I noticed there's a handful of spattering of these vague restrictions that were targeting machine guns. And sometimes the way they interpret or they defined a machine gun would technically take into account some automatic rifles. I don't think that they were targeting some automatic rifles. Well, they didn't exist, did they? They didn't exist, did they? Semi-automatic rifles in 1920. Oh, yes. Yes, your honor. The record shows if you look at the expert, Steve Hellsley's declaration, he lays out the history. I believe the Duncan opinion actually goes through some of rifles history. Right. Right. So were they banned by the machine gun ban? No. The federal the federal National Firearms Act. No, it's not. But there were some state, I believe what Judge Bumatai was referring to was there some state, a handful of state laws that targeted machine guns before the NFA. And they were inartfully drafted, which, you know, respectfully to our legislators, a lot of these gun control laws are because they don't understand. They don't understand firearms. And so they they make these laws that they think do something. And then they go back and say, oops. And I think this was actually one of those. So is your argument then that even if they did regulate what would be semi-automatic rifles by today's standard, that that they don't count as a historical analog regulation or of that sort? That's correct. I don't think one, two or three off laws in this country's history is going to be sufficient to make the case under this court's precedent that has to be persuasive evidence of historical restrictions. And I think that that that sort of suggests that there is a consensus, right, or at least a lot of governments who are concerned about this. It's not just one or two off laws that that were very odd and that ended up being repealed. Almost all of those laws were eventually amended to specifically target machine guns or they were repealed. The only one that stays, I believe, is Washington, D.C. Can I ask one other threshold question? It looks like commonality. You're suggesting commonality. How common the weapon is, is part of the test of whether or not it's protected by the Second Amendment. Where does that come from and how is that not a circular argument? If the state bans something, how it's not going to be common, I assume. Sure. That comes from Heller that laid out the test that arms that are typically possessed by law abiding citizens for lawful purposes are protected. And you you are correct, your honor, that it is a circular test to an extent in some degree. You know, as Judge Hurwitz explained, people can get there before by Claymore mines, before the government comes in and opposes them and then they're protected. Or the government gets there first and bans some new technology before they become popular. And the Duncan court mentioned that as well. And it is something that courts will have to wrestle with. But I don't think that this court has to with this particular issue, because these rifles are, as the Duncan court explained, the most popular rifles in American history. And and they're owned by the millions. The record reflects their use in the World Series of shooting at Camp Perry. They're there. They're everywhere. And so with that, I would like to unless anybody has another question, I would like to reserve the rest of the time. Well, you don't have any time to reserve, but we'll give you I was telling you, we'll give you a couple of minutes at the end, too, because we took you over with our questions. Thank you for the state, Mr. Thank you, your honors. May I please the court, Peter Chang for the California attorney general, California's restrictions on assault rifles as defined by the Assault Weapons Control Act is constitutional and is notable to clarify at the outset that California does not restrict all semiautomatic rifles, which is claimed by its incorrect overbroad term. And plaintiff, my colleague on the other side, I said, you know, we should look, the court should treat these firearms as a unit, but they're not. Rather, the regulations that issue here restrict only a specific configuration of semiautomatic rifles. At the record shows to be particularly lethal of being used to use disproportionately in public mass shootings and against law enforcement officers. And it's not simply the automatic rifles with a pistol grip or with a detachable magazine. Rather, the law restricts only semiautomatic rifles with three distinct components. That must be a semiautomatic rifle that's capable of firing centerfire rounds, that is capable of accepting a detachable magazine and which has one or more of the enumerated features. If any of the three components are missing, it is not an assault rifle under the AWCA. What about the what about the part of the statute that names specifically banned rifles? Do all of those have these features that you've just spoken of? All of the all of the the rifles that are identified by make and model, they all do, except for one, the S.A.K.S. with detachable magazine. That rifle was was placed on the list because at the time it was viewed as a military weapon. But let me ask the question, this question differently, identify at least so that I could go look it up, what semiautomatic rifles that are commonly sold are not covered by this ban? Well, it's it's any semiautomatic rifle that does not have all three of those components. I understand that. I've read the statute. I understand the statutory distinction. I'm trying to figure out whether in the real world, as a practical matter, there are semiautomatic rifles that are not covered by the statute. There are, Your Honor. The record on page 1924 specifically identifies semiautomatic rifle with fixed magazine that comes, you know, which comes standard. And, you know, the in that particular part of the record is the 2018 standard catalog of firearms. So they do. Is that the Ruger you're referring to? I don't have the catalog in front of me. I don't know specifically what what rifle that is, but they do exist. And another thing. The reason I'm asking is the it seems to me what your opponent is arguing is you've effectively banned access to semiautomatic rifles. Whether or not that makes a legal difference. Let's just put aside for a second. Now, I'm trying to figure out. I know that I can parse the statute and say I can define a semiautomatic rifle. It doesn't fit within the statutory ban. But I'm trying to figure out, are there if I went out to look for one, would I find one somewhere? Absolutely, Your Honor. And I have to to two points on that first. It's just a matter of the record shows that most semiautomatic rifles in California are not considered assault rifles. And second, these rifles, I mean, to kind of highlight the fact that the law only restricts a specific configuration of semiautomatic rifles is that these various components and parts of the semiautomatic rifle can be taken apart, can be replaced, can be exchanged. A rifle with a barrel that is capable of firing centerfire rounds can be replaced with one that can be fired with rimfire rounds. Any of the enumerated features can be removed from a rifle or exchanged for something else. And same with the detachable magazine. Every one of these components or features can be replaced. Counsel, do you agree with Mr. Rupp's statement, Rupp's counsel's statement that the firearms here include the most popular weapons in history? I don't, Your Honor. There's simply no evidence to show that. What we do know is... I mean, but you would agree, though, there are millions of these weapons in the country, though. We don't. We don't know. I mean, there is, to start, we're talking about a specific configuration of semiautomatic rifles, not a category or not a unit of firearms. These are specific configurations that people can change out parts. A rifle that is an assault rifle, someone can change out a part and make it not an assault rifle. So there's really no indication of how many of these there are. We do have evidence in California, but as a nation, we don't know how many semiautomatic rifles that fit the definition of assault rifles exist. In California, isn't it 166,000, is that right? That's correct. In Cayetano, didn't they say that 200,000, I think, stun guns or tasers in the country was enough to meet the common test, common use test? I believe in Cayetano, the court did not set a numerical standard for determining what is unusual. I believe the court there also looked at the characteristic of the weapon. Now, the court didn't specifically say that, and it's a concurring opinion, but I think for an example, we can look at Heller itself. Heller specifically identified the machine gun as a weapon that's unquestionably can be banned and has been banned. However, when the federal government did not ban the machine gun until 1986, and when it was banned in 1986, there were over 630,000 machine guns in private hands at the time. And so we know the... But I think what Judge Bumuteh was asking was, isn't the ubiquity of these weapons in California right now enough to establish commonality for whatever legal consequence it has? That's a separate question. Well, in terms of saying that 166,000 assault rifles in California is commonly used, we also have to see why it is commonly used. That's right. But that's another part of the analysis. I'm just trying to focus right now, and I know the two of you disagree on what the consequences of commonality are, if you will. I'm just trying to figure out as a factual matter. It just seems to me intuitively obvious that there's lots and lots of these around. Maybe you can ban them, even though there's lots and lots of them around. But isn't that one issue we can sort of agree? Is it established by the record that there's a ton of these out there? Well, I think for what is common use, I don't think the court can simply say, well, there are a ton. The court requires evidence. And here there's not evidence. Well, we do have some evidence in your records of what 160, when we start to talk about the number that were registered. And we know that a lot of people have these weapons. I'm not sure I know how they use them or what they're necessary for or whether there's alternatives. But don't we at least know that a lot of people have these weapons? We know in California, taking the 166,000 figure, we know there are 166,000 assault rifles registered in California. We don't know how many of them are possessed, are individually possessed. 166,000 assault rifles does not mean there are hundreds. They're possessed by 166,000 individuals. The concentration of firearm ownership is extremely concentrated. Is the analysis a California one or a national one? You know, we believe it is a national one, but there are no national numbers. And the only evidence we have is specific to California. See, I guess my problem is that I think if your entire case turned on commonality, you'd be in trouble. All right. So it seems to be intuitively obvious that they're common. I walk out in Arizona and I see people whom I think are reckless, but they nonetheless are carrying them on the street. So the real question for me is, let's assume commonality. Tell me, assuming commonality, why you think your ban is constitutional. Sure. And even assuming commonality, we we would argue that it still does not mean that assault rifles are within the scope of the Second Amendment's protection. Assault rifles are virtually identical to the M-16, which Heller has said may be banned. It's how are they? Maybe it's one word there, though, right? It's not two words. Heller said it might be. It's possible. It didn't say maybe banned. It said maybe it can be banned. Correct? Right. Correct. It said if weapons, M-16 and the like, most useful military service may be banned. You're correct. Can you explain how they're virtually identical? I'm sorry. Go ahead, Judge Preston. I think we were about to ask the same question. So go ahead, counsel. Right. The only difference between an M-16 rifle and an assault rifle is that the M-16 rifle is a select fire. That means in addition to firing in semi-automatic mode, you may also fire in automatic mode. So there are two reasons that that's that distinction for purposes of determining whether an arm is within the scope is not relevant. First, the automatic fire capability is one that the Supreme Court addressed in a different part of its analysis in Heller. The court said machine guns can be banned. It would be startling to think that machine guns cannot be banned. Machine guns, by definition, are automatic weapons. So I believe that means that when the court looked at the M-16 and why it may be banned, it's looking at the other features, the other combination of features that exist also in assault rifles. And second, the court in Heller described M-16 and the like as weapons most useful in military service. However, the U.S. military specifically instructs the soldier. Can I go back to you? So the distinction between the weapons banned by California and M-16 is that it's semi-automatic. And you're saying that that's virtually indistinguishable from being automatic. What I'm saying is that's a different feature. I'm not saying that that makes it virtually indistinguishable because there is a distinction. Well, that's a huge distinction in my mind. But you're just washing it away. Right. I'm addressing. I'm trying to address, Your Honors, that distinction specifically. And is that, one, the Supreme Court addressed the automatic firing capability in a different section of its opinion when it addressed machine guns, which are, by definition, automatic rifles. Mr. Cheng, if someone were to disagree with you on that point, on the comparison with M-16s, what would be your remaining arguments as to why these weapons are outside the Second Amendment? The commonality, which we've already discussed, and then the dangerous and unusual, which, you know, kind of all fits together within the, you know, dangerous and unusual and commonality or common use for self-defense. Well, let me try. Let me try on you the question I asked to your colleague, because I'm trying to get this into a context. So let's assume that I conclude that these types of weapons are within the protection of the Second Amendment because of their commonality. How do I then determine whether or not what you've done in California is unconstitutional? Do I apply strict scrutiny? Do I apply intermediate scrutiny? I know which one you'll choose. And if you choose behind the correct door, why does this need intermediate scrutiny? Yes, Your Honor. So the 1st, 2nd, 4th, and the District of Columbia circuits have all determined that intermediate scrutiny applies to examine similar restrictions on assault weapons. In this case, there's no difference. The restrictions here place at most a slight burden on the Second Amendment's core purpose of self-defense. As stated before, they apply only to a specific. Well, doesn't the Second Amendment protect the arms? And it's a complete ban on an arm used to possess that at home. So why isn't this not strict scrutiny? Arms, arms only in a specific configuration. Now, we know it's not arms because we know, as Your Honor brought up earlier, grenade launchers. Plaintiffs aren't challenging that, and I believe there'll be no dispute that grenade launchers, machine guns, short barrel rifles, they're all outside the scope. Well, once we're into the scrutiny land, we're already conceding that these are arms protected by the Second Amendment. And so once we do that, this is a complete ban on them in the home. So under our Ninth Circuit precedent, how is this not strict scrutiny? Well, I think we can look at, for example, in Jackson, the court said hollow point rounds may be banned because it looks at it's a light burden because there could be alternatives. That alternatives to hollow point rounds, like full metal jacket rounds, are as effective for self-defense purposes. And the court in Jackson said that's sufficient. That shows that the burden is not severe, that this goes to intermediate scrutiny. Do we do that for any other right where we look at a fundamental right and say, well, we could restrict one right because you have alternative rights? Do we do that in the First Amendment? I believe so, Your Honor. I mean, the First Amendment definitely restricts certain types of certain types of situations or permit those restrictions. For example, you know, it's it's constitutional to restrict, you know, yelling fire in a crowded theater because it, you know, there's effects. It could cause injury and death to other people. You know, it depends. I think most courts would say that that's just not protected by the First Amendment. But whereas if we can see that an arm is protected by the First Amendment or a right is protected by the First Amendment, where do we say that it's OK to restrict it as long as you have alternatives? Well, I think the the another example, it's not something that has been addressed by by, well, for example, in Pena, this court found that it's fine to restrict certain types of handguns. And now we're talking about handguns, the quintessential self-defense weapon. It's it's it's fine to restrict them. You know, when certain handguns that are permitted in other states, when there are, you know, many other handguns, alternatives that Californians can turn to. And another I want to ask you a question about the record, because this I couldn't find in the record, but maybe it's there. Is there anything in the record about the ease in which semi-automatic weapons, certain ones can be converted into fully automatic weapons? Yes, Your Honor. In the record, Detective Mercer with the Los Angeles Police Department mentioned it. It's very easy to convert it. You drill some holes and you add a part. And then the Supreme Court in Staples also just also discussed how easy it is to convert. You know, I knew Staples said that. I was trying to figure out there is something in this record, too, about that. Correct. It's Detective Mercer had testified as to that effect. I believe it's it's cited in the brief. OK. Can I ask two quick questions? Do do California police officers have access to these banned weapons? They do. OK, and second, are you making amicus in every town has argued that there has been historical regulations related to semi-automatics. Do you take that argument that there is a historical limit lineage to these type of regulations? Or but I mean, my understanding is California was the first to do this in nineteen, I think, eighty nine or so. These specific assault rifles. But let me turn to the question your honor asked first, before I come back and address this law enforcement officers do have access to what we the AWCA categorizes as assault rifles. However, there's testimony in the record that says, you know, unlike civilian use, law enforcement are more prone to place themselves in offensive situations, which is not a self-defense. Well, doesn't that undermine your argument that these are only military use weapons? If civilian police use it, then it's not only military use. There are offensive weapons. I mean, they were developed as military weapons and when they when they went into the civilian population, law enforcement use them for offensive purposes. But I do want to address your honor's second point about the history and tradition. There is a history and tradition of banning dangerous weapons in this. The you know, as every town's points brief that every town's brief pointed out in the founding era, dangerous weapons like trap guns were prohibited. Bowie knives were prohibited. And also as to semi-automatic weapons, the plaintiffs acknowledged that laws in the 1920s, different states, as well as the model law, all restricted. Doesn't that argument conflate? And, you know, again, I'm trying to stick with what we've said the analysis is. The first question is, is a weapon both dangerous and not commonly held? And if it is dangerous and not commonly held, it falls outside the Second Amendment. But if you concede that it's commonly held just for purposes of argument, then then it's not enough to say it's dangerous. Right. We still have to then move on to what level of scrutiny we're going to apply. Isn't that what the Ninth Circuit case law says? Absolutely, your honor. And that deals with how severely the burden is. OK, so so now now the problem is that that the long term regulation is something we look at at the second level, isn't it? Not at the first level. The well. Where is it? Tell me where we look at it. I think it's almost as if it's a separate analysis, the history and tradition of prohibiting certain types of rifles. It's not part of the two step test, but, you know, it's been discussed often. So here's my problem. To the extent that the history and tradition shows that they're not commonly held. That's one thing. But you can't I can't don't think you can use a history and tradition of regulating dangerous things to say that all dangerous things are covered by the history and tradition. That's sort of a circular argument, the same circular argument I worry about when you define the category. Either side defines it. But it seems to me that the fact that dangerous things have been regulated in the past doesn't mean that all dangerous things fall out of Second Amendment outside of Second Amendment protection, does it? Absolutely, your honor. I think that's that's right. However, the the laws in the 1920s specifically prohibited semiautomatic weapons, not just dangerous weapons, but semiautomatic weapons, weapons that can be fired more than a certain number of rounds without reloading. And I think that's different. I understand that argument. I was just I was responding to your invocation of the Bowie knife or or or other weapons that might be dangerous because it seems to me that proves too much. I understand your argument based on the bans of semiautomatic weapons. That's a different issue. Correct. And I would say I've seen that my my time has run out. I would like to say just as a final point, you know, we believe that this could be an analyzed intermediate intermediate scrutiny. But even if the court decides to review this under strict scrutiny, we believe this restriction passes strict scrutiny. It's very narrowly tailored to a very specific configuration that the evidence in this case shows is dangerous and particularly dangerous in public mass shootings and dangerous to law enforcement officers. Can I ask a follow up on that? And what makes it particularly dangerous, particularly dangerous? Isn't it because it's more accurate? It's more accurate when it is fired in a rapid rate on a single shot basis. Does the government have an interest in having less accurate guns out in public? No, it's well, in the public setting. Yes. I mean, in a public mass shooting situation, we don't want the shooter to possess a rifle that can be fired very rapidly, very accurately. What about in the self-defense setting? In a self-defense setting, those features are simply not necessary. And we have. But they make it more accurate. Wouldn't you want more accurate weapons in a self-defense setting? In a self-defense setting, there's no need for rapid fire. In the average self-defense situation, an average of 2.3 rounds of fire. There's no need to fire off 10, 20 or 30 rounds in a very rapid succession. And also, please, Judge Hurwitz. No, I didn't have a question. I just clicked my pen. It must have. It must have triggered the zoom. OK. And in fact, what you're looking at specifically as self-defense, the plaintiff's ballistics expert has said a semi-automatic rifle with centerfire barrel that has to feature, which has fixed magazine, which is not an assault rifle under the AWCA, that is just as effective for self-defense purposes as an assault rifle. And this is on page 3621 of the record. And so, you know, we can see from that that, you know, they're just assault rifles are not well suited or even not necessary for self-defense. In 95 percent of the situations, merely displaying the weapon causes the burglar to run away. And plaintiff's ballistics expert has testified that in that kind of home intrusion situation, the intruder can't tell whether a rifle is an assault rifle or a semi-automatic rifle that doesn't fit under the definition as long as the rifle has an enumerated feature. Mr. Chang, I think you've exhausted your time. I want to make sure none of my colleagues have further questions. If not, why don't we give, why don't we give counsel for the appellant a couple more minutes and that'll sort of even up the total time for each side. Thank you, Your Honor. Really briefly, Judge Hurwitz, I just wanted to clarify something. I don't want us to have a misunderstanding in what I think you thought I said. I'm not arguing that the ban on these rifles means that there are no semi-automatics available. There certainly are. There's, as I believe you were indicating, the Ruger Mini-14, M1A, the M1 Carbine. There's plenty of semi-automatic rifles. OK, but that leads to the question, so why is this a categorical ban, in your view, that has, it's a ban of certain, of a subcategory of semi-automatic weapons? If that's true, what's our level of scrutiny? But that's why I wanted to make the point and raise it with you that I don't, I think it still is a ban on a category, because if you're talking about the most popular, the most popular rifles, which are the AR-15s, Duncan said it, the Staples Court indicated it, the record reflects, which I'll show, that they are owned by the millions. If they are the most popular, they cannot be considered a subset of something. They are, that's why, how do we figure out what a category is, if it's relevant? Well, I think one way is that the state's done it for us. It's categorized these rifles as assault weapons. It has. That's the same problem I had with your friend's argument. It's sort of circular. Whatever is prohibited is a category. Therefore, nothing can be prohibited. His argument, whatever was dangerous in the past was prohibited, therefore all dangerous things. Therefore, we have a tradition today. I'm not, I'm still not, I'm still trying to figure out how we define categories. Is it by popularity? Is it by, I don't, the cases don't help me, so tell me how you think I define category. Sure. I think that in this instance, you're talking about a category of rifles that people are choosing, right? The reason I brought this up, that there is a difference, that there are these arms that are available without the features, is to show that the public has the option, and the public is overwhelmingly just choosing, is exercising that option to get the rifles with the features on them. And so I think that, if anything, the non-featured rifles are the subset of modern rifles. It's not the other way around. These are the mainstream rifles. The other ones are the lesser-owned. And that's why I wanted to bring it to your attention, just to clarify and to raise... No, I didn't understand you were arguing to the contrary. It just led to the question that I'm now asking. Got it. And in response... Can I have a follow-up on that? Do we even need to get into this categorical, or a class, or a category? I mean, I thought one of your arguments was that if it's an arm, any arm that's protected by the Second Amendment, then strict scrutiny would apply. That is correct. That is our position. Yes, I don't think you need to. But I was answering Judge Hurwitz's question. Okay, that makes sense. Thanks. Maybe that will help them with struggling with that. So I appreciate your honor. Thank you. I appreciate it. You've now exceeded the extra two minutes we gave you. But if you want to just sum up, we'll be happy to hear. Sure. I think, at bottom, the state's position is that it can wholly ban rifles that this court has declared are the most popular in the history of this country solely because they have features that make them more accurate and more easy to control in the hopes that it might hinder some evildoer in inflicting harm in an anomalous event like a mass shooting. And the Supreme Court has said that looking at things like that is not appropriate. The criminal misuse of firearms does not matter. What matters is whether the American people choose them. And the record reflects, despite my colleague's assertion to the contrary, that they overwhelmingly choose these firearms for lawful purposes, including self-defense. With that, I will submit. Thank you. Unless my colleagues have other questions, this case will be submitted with our thanks to both sides for their briefing and arguments. And thanks to the various amici for their briefing in this case. We will be in recess. Thank you, Your Honor. This court for this session stands adjourned.
judges: Hurwitz, Bress, Bumatay